I have been doing this for a while but never backed back. I must confess, for many years I have made it my habit to not look at any notes while I address the Court, and I have to say that getting ready for this hearing is not an easy task. This one, I said, I'm just going to read it. So I apologize for that. That's quite all right. You said earlier this is an entirely different patent. It is indeed. Okay. We're going to address two issues. The first issue is whether there is substantial evidence to support the finding below that Alcara discloses the use of a, quote, relatively non-uniform etching profile. And again, we contend that there is not such relevant evidence as a reasonable mind might accept as adequate to support a conclusion when the evidence is considered as a whole. The phrase non-uniform etching profile appears twice in the claim. And I quote, etching said top film surface to define a relatively non-uniform etching profile on said film and defining etch rate data, and I'm skipping, which defines a position within said non-uniform etching profile. Conclusions can be drawn from this claim language. One, the uniform etching profile is the final completed etching profile, not an intermediate profile. Two, the reason for the non-uniform profile is to use it for a useful purpose. Let me just sort of try to clarify in my mind. What's your main dispute for the reliance on Alcira? Is it because this was not the preferred route for Alcira? Is it because Alcira, you think, taught away from what the board concluded? So what's your precise problem with the use of Alcira? Frankly, I don't think Alcira does a whole lot, but if you'll bear with me, I think it will become clear. Okay. Two, the reason for the non-uniform profile is to use it for a useful purpose. Three, the useful purpose for the non-uniform profile is to obtain, quote, etch rate data. This is from the claim. Etch rate data comprising an etch rate and a spatial coordinate which defines a position within said relatively non-uniform etching profile. Four, using a uniform as opposed to a non-uniform etching profile would produce all the same etch rate data because the etch rate in the vertical axis would all be the same. Whereas using a non-uniform profile will yield different etch rates at different positions in the vertical axis or Z direction as shown in figure 1A of the patent. None of this is taught in any of the cited prior art. A, it is undisputed that the decision and appellees rely solely on Alcira for the, quote, non-uniform claim element. B, it is undisputed that Alcira's figure 2 is not the final completed etching profile, but a snapshot partway through the etching process. C, Alcira's figure 6, which appellees rely on as teaching, does not teach or suggest a non-uniform etching profile at the end of the etching process. The figure clearly shows that the film thickness H is zero at all radial positions, i.e., all the film has been removed. And as Alcira states about figure 6, quote, for this particular example, the film will be completely cleared after a dimensionless time of 10.1 has elapsed. That's at appendix 1234, column 1. Figure 6 of Alcira shows non-uniform stripping, but not non-uniform etching profile. D, Alcira does not teach or suggest using the etching profiles of either figure 2 or figure 6 for any purpose, and certainly not for defining etch rate data. Accordingly, there is no substantial evidence that Alcira shows a non-uniform etching profile. Okay, okay, I've listened to you read your stuff, and unfortunately, and maybe it's me and not you, it hasn't become entirely clear, having let you continue. So let me just try to ask you. Are you suggesting a claim construction dispute here, which wasn't raised below, about what relatively non-uniform means? No, Your Honor. Is that where you think you parted ways with the board? So can you just tell me in English what Alcira talks about uniform, but then it also includes non-uniform? That non-uniform is not necessarily preferred, but it's disclosed. Do you disagree with that? The whole point of Alcira is, as in most things in the semiconductor industry, you want a uniform profile. And so the fight continues decade and decade to try to get that uniform profile. He mentions non-uniform profile only in the context of you don't want non-uniform, you want a uniform profile. He has a Figure 2 that it is understood plainly shows the creation of a relatively non-uniform etching profile. Do you disagree with that? What he shows in Figure 2 is, as he explains explicitly, is a snapshot of his etching process. So his etching process goes to the end, and in the end, there is not a non-uniform profile. And he doesn't use what he shows in Figure 2 for anything. But he does disclose it. Well, I guess you could say that, although I... If you're looking at prior art, you're looking at the question of what is disclosed, aren't you? Well, I suspect there's tons of prior art that show non-uniform profiles because that happens in the industry. I mean, if you're pushing for uniform, logically follows that there's going to be a lot of non-uniform. But what this pattern is about is deliberately getting a non-uniform profile so that you can get different etch rates to ultimately get what you want. And Alcar doesn't show that, and he doesn't do anything with his Figure 2 because, as I say, that's just during the process. It looked like that at one point, and at the end, it ends up to be uniform. So neither Figure 2 nor Figure 6 shows a non-uniform profile. But part of the question is whether one of ordinary skill in the art would extract from Alcar. What would one with skill in the art understand from Alcar? I don't think one skill in the art would learn anything from Alcar having to do with the patent suit. Okay. Thank you. Good morning, Your Honors. May it please the Court. Directly addressing the disclosure of Alcar and its teachings, we submit that there was more than substantial evidence on which the Board based its decision that Alcar discloses a relatively non-uniform etch profile. That evidence includes, of course, Figure 2 itself, which Dr. Graves, an expert in chemical engineering, testified before the Board that the Figure 2 shows a tapered profile. Alcar itself says that the etching at the edge of the wafer is at the highest and that the etch rate diminishes as you move towards the center. So you have a higher rate of etching at the edge. The film is cleared, in fact, at the edge. It then shows a convex profile, clearly non-uniform, before reaching the middle. So Alcar itself clearly discloses this. Figure 6, which counsel said refers to stripping, in fact, in the text of the figure itself, it refers to etching explicitly. Where is that? That is in Figure 6, appendix page 1234, and it says, quote, film thickness distribution at different cumulative etch times. Where is that? I'm on the right page, but are you looking at the left column or the right column? My apologies, Your Honor. That's all right. The left side, lower left, right underneath where it's describing what Figure 6 shows. So it's immediately, it says Figure 6 colon, and then it goes from there. And twice refers in that description of Figure 6 to etching. But be that as it may, with respect to Figure 6, it is clearly showing non-uniform etch profiles as a function of time. The etching, again, at the edge, towards the edge of the wafer, is much higher than it is towards the middle of the wafer, which is by definition non-uniform. What I heard counsel to argue, in fact, is a claim construction argument that was not made below and is therefore waived. The argument seems to be, and it was frankly raised for the first time in the reply brief here, the argument seems to be that this evidence of a non-uniform etch profile has to be at the end of some etching process. Beyond being new, that argument finds no support in the claim language. The claim language simply says that you etch. You perform etching, and then you have a non-uniform etch profile as a result of that etching. It doesn't say how long it has to go. It doesn't say that some process of fabrication has to be completed. What's more, I would refer the court to column 5, lines 22 to 23 of the patent itself. At that column and at those lines, the patent actually says that in the patent, when you're creating this profile, you actually stop. I'm sorry, can you tell me again what column and what I mean? Yes, it's column 5, and I'll refer the court to lines 22 to 23. Here in this part of the patent, and I'll refer you to appendix page 107. In that column and lines, what the patent is talking about is performing this plasma etching. There it says that plasma etching of the film stops before the end point, or etch stop. The idea is that in this patent, in the preferred embodiment, you don't etch all the way through the film. You stop before the end point of the etching. Just like the patent, and we don't even know this, whether Alkire's process was complete or partial, but even for the sake of argument, if that's the case, the patent seems to disclose that very same technique. The next argument that I heard counsel make was that Alkire does not show, essentially, the use of this non-uniform etch profile with respect to the use of that for etch rate data, which is the next part of that claim. But as the board found, and as was submitted in the petition to the PTAB, the combinations here were to combine Alkire, on the one hand, with Kao, and also Goluski, on the other hand. And it was those two references that used empirical data. In the one case, etch data for Kao. In the Goluski case, deposition or growth rate data on the other. And it used that data in connection with gathering that empirical information, figuring out what the etch rate was in that empirical etch, and then extracting the surface reaction rate constants from that empirical data. So the argument below, as embraced by the board, was that you would take this art and these teachings in combination. The board found a strong motivation to combine these references together and to take those teachings in tandem, and to then use that empirical evidence from Kao and Goluski and combine it with Alkire to achieve the claimed invention. We submit that there was no error below, and the substantial evidence supported the board's decisions. I'd be happy to answer questions on other aspects that were raised in the paper, if the court has any questions. Thank you. Thank you, Your Honor. Perhaps I misheard counsel, but I thought he said that in Alkire, figure 2 is the final profile. That is absolutely 100 percent wrong. Now, with regard to figure 6, he says that it's etching, not stripping. That perhaps is my fault by using the word stripping instead of etching. I think those are both the same thing. The real point about figure 6 is they are saying it shows a non-uniform profile, and if you look at the figure, it shows that all of the etchings end up to be the same place, i.e. 0, which means that they have stripped away all of the resist. Did I misunderstand you earlier saying that figure 6 stripping is not the same thing as etching? No, I didn't say anything like that, and if I did, I misspoke. What I was saying was that the strip rate or the etch rate does change in figure 6, but the important thing is what you end up with at the end, and that is not uniform. So you have non-uniform stripping or etching, but you have a uniform etch profile. With regard to the end profile, again, I would say that Alcar would not teach the person skilled in the art anything, and he certainly doesn't show having a non-uniform profile. Counsel quotes from the patent with regard to an etch stop. The reason that you have an etch stop is once you've etched in certain places, if you continue to etch, you'll go into the substrate below that, and that's bad. So that's all he was talking about then. So he's talking about a very minor thing. But what he's trying to do, and it's clear from figure 1A in the patent, he wants to have different etching so that you end up with that the distance from the substrate to the top of the etched material is different across the whole thing, so he can get different data by using the non-uniform profile. And as I said before, if you had a uniform profile, you'd get all the same data, which wouldn't be helpful. So what he's doing is he's getting all this different data and then moving on from there. Is there anything else? Okay. Thank you. Thank you. We thank both sides in the cases.